IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | No. CR10-0024 |
| vs. | REPORT AND RECOMMENDATION |
| KENNETH FLOYD BOWMAN, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II.  PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.  ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

IV.  RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

V.  DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
    A.  *Was the Traffic Stop Unreasonably Prolonged?*. . . . . . . . . . . . . . .  6
    B.  *Was Defendant Seized Without Reasonable Suspicion?*. . . . . . . . . .  10
        1.  *Was Defendant Seized As He Walked Back to His Car After
            Receiving the Warning Tickets?*. . . . . . . . . . . . . . . . . . . .  10
        2.  *Did the Trooper Have Reasonable Suspicion to Seize
            Defendant?*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
    C.  *Did Defendant Voluntarily Consent to A Dog Sniff?*. . . . . . . . . . .  14
    D.  *Was There Probable Cause to Search the Vehicle?*. . . . . . . . . . . .  16

VI.  SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

VII.  RECOMMENDATION. . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

# I. INTRODUCTION

On the 25th day of May 2010, this matter came on for hearing on the Motion to Suppress (docket number 16) filed by the Defendant on May 5, 2010. The Government was represented by Special Assistant United States Attorney Daniel Aaron Chatham. Defendant Kenneth Floyd Bowman appeared personally and was represented by his attorney, Michael K. Lahammer.

# II. PROCEDURAL HISTORY

On April 2, 2010, Defendant Kenneth Floyd Bowman was charged by Indictment (docket number 2) with possession with intent to distribute 500 grams or more of cocaine, after having previously been convicted of a felony drug offense. Defendant entered a plea of not guilty and trial was initially scheduled for June 7, 2010. At Defendant's request, however, trial was continued and is now set for July 12, 2010.

On May 5, 2010, Defendant timely filed the instant motion to suppress.

# III. ISSUES PRESENTED

Defendant asks that the Court suppress all "items and information obtained" as the result of a search of Defendant's vehicle on March 10, 2010. Defendant claims (1) the initial traffic stop was prolonged beyond the time reasonably required to complete its purpose, (2) after being given warning tickets, Defendant was subsequently seized without reasonable suspicion, (3) Defendant did not voluntarily consent to a "dog sniff," and (4) the alert by the drug dog did not provide probable cause to search.

# IV. RELEVANT FACTS

At approximately 1:33 p.m. on March 10, 2010, Trooper Justin Simmons of the Iowa State Patrol conducted a routine traffic stop on Interstate 80 near mile marker 267 in Cedar County. Trooper Simmons testified that he was traveling eastbound on I-80 when he noticed a black BMW approaching on the on ramp, with a dark window tint. Simmons caught up with the vehicle and "paced" it by driving alongside. Simmons observed that

the vehicle was recently registered in Utah and had clothes hanging in the back window. Simmons could see the driver and a front seat passenger.

Trooper Simmons pulled the car over for speeding and excessive tint on the windows. At that time, Simmons mistakenly believed that eastbound I-80 in that location was a construction zone, with a 55 mph speed limit. In fact, the construction zone was for westbound traffic only. Simmons testified that the window tint allowed only 28% of sunlight to pass through, while in Iowa windows must allow at least 70%. Defendant does not contest the validity of the initial stop.

After the vehicle pulled over, Trooper Simmons approached it on the passenger side.[1] Simmons observed travel bags in the back seat, trash on the floor, and three cell phones. According to Simmons, the passenger was "rapidly" eating Chex Mix. Simmons advised the driver, who was identified as Defendant Kenneth Floyd Bowman, of the reason for the stop. Defendant was asked to produce his driver's license, registration, and insurance. Simmons also asked the passenger to produce identification. Defendant produced a Utah driver's license and the passenger produced a Mexican identification card, with the name Oscar Flores. Two minutes into the stop, Simmons advised Defendant that "I'm going to write you a warning," and asked him to come back to the squad car.

Trooper Simmons testified that after returning to the squad car, Defendant smelled strongly of "air freshener," his breathing was elevated, and the "carotid on the left side of his neck was beating rapidly." Simmons asked Defendant "what are you guys up to today?" Defendant identified himself as president and CEO of Network Connections, and stated that he was going to Chicago on business. Defendant identified the passenger as Oscar Flores, and told Simmons that Flores worked for him as an installer. Defendant also stated that Flores had dated his daughter for the last five years.

---

[1] The stop was recorded on a camera in Trooper Simmons' car and a DVD of the activity was introduced at the hearing as Government's Exhibit 1.

3

Approximately 2-1/2 minutes after entering the squad car, Trooper Simmons asked Defendant whether he had been arrested before. Defendant stated that he had been arrested for "paraphernalia" about 20 years ago. Simmons then called the dispatcher with Defendant's driver's license information. After asking Defendant about Flores' age, Simmons also called dispatch requesting information on Flores. For the next few minutes, Simmons questioned Defendant regarding where they would be staying in Chicago and why Defendant had Flores along. During the course of the conversation, the dispatcher reported that she was "getting quite a few results back for Kenneth Bowman," and requested additional information.

After being in the squad car for approximately seven minutes, Trooper Simmons returned Defendant's driver's license and indicated that he needed to get the VIN from the car and return Flores' ID. After obtaining the VIN, Simmons walked to the passenger side of the vehicle and talked with Flores. Flores told Simmons that he was not sure where they were going, where they were staying, or for how long. Flores identified himself as a construction worker, but indicated that he was currently unemployed. Flores also told Simmons that Defendant worked for a non-profit organization. Simmons testified that Flores appeared "really nervous," his leg was "bouncing," and he avoided eye contact.[2] Simmons talked to Flores for approximately 2-1/2 minutes.

Upon returning to the squad car, Trooper Simmons received a report from dispatch indicating that she would send Defendant's record by email. Simmons completed the warning tickets, gave them to Defendant, and stated "you have a nice trip." Defendant then exited the squad car at 1:47 p.m., approximately 14-1/2 minutes after he initially pulled over.

Immediately after Defendant exited the squad car, however, Trooper Simmons also exited the car and met Defendant in the area between the two cars. Simmons asked Defendant "have you got time for a couple of quick questions?" Simmons asked

---

[2] It was later determined that Flores was in the United States illegally.

Defendant whether he had anything illegal in the car, including weapons and controlled substances. Defendant answered no to each question and volunteered "I don't do drugs."

Trooper Simmons then asked Defendant if he could search the car. Rather than answer the question directly, Defendant asked Simmons "why do you want to search the car?" Simmons responded that he had "some indicators" and then asked "you don't want me to search?" Defendant responded "no."

Trooper Simmons then asked: "Would you mind waiting for a canine to do a free air search of the car; is that cool?" Defendant responded "yeah, that's cool." Simmons instructed Defendant to get back in the squad car, but Defendant started to walk toward the passenger side of the BMW. While Defendant's statement is not entirely audible on the DVD, he apparently says something about Simmons being able to look in the car. Simmons responded "no, I don't want to search it any more." The encounter between Simmons and Defendant between the cars lasted approximately one minute.

Both Trooper Simmons and Defendant then got back in the squad car and Simmons asked dispatch for a canine unit. The request for a drug dog came at 1:49 p.m., approximately 16 minutes after Defendant initially pulled over. While waiting for the canine unit, Simmons asked Defendant about his prior criminal record. The canine unit arrived at 1:53 p.m., approximately 20 minutes after Defendant initially pulled over. Trooper David Baker, the canine handler, walked around the BMW to check for hazards. The dog, Jake, then began his search. At 1:57 p.m., approximately ten minutes after Defendant was given warning tickets and told to "have a nice trip," Jake alerted to the presence of narcotics at the rear passenger side door. A search of the vehicle followed.[3]

---

[3] Four officers searched the vehicle on the side of the road for more than 30 minutes, but did not find any contraband. The car was then driven to a DOT facility, where a more extensive search located cocaine in a compartment behind the rear seat, near where Jake alerted.

## V. DISCUSSION

In his initial brief, Defendant asserts three arguments in support of his motion to suppress. Specifically, Defendant claims (1) the initial traffic stop was prolonged beyond the time reasonably required to complete its purpose, (2) after being given warning tickets, Defendant was subsequently seized without reasonable suspicion, and (3) Defendant did not voluntarily consent to a "dog sniff." After the motion to suppress was filed, however, Defendant retained new counsel. At the time of hearing, Defendant asserted a fourth argument, claiming that the alert by the drug dog did not provide probable cause to search. The Court allowed both sides to submit a supplemental brief on that issue.

### A. Was the Traffic Stop Unreasonably Prolonged?

Defendant does not contest the validity of the initial stop. Defendant argues, however, that the stop was prolonged beyond the time reasonably required to complete its purpose. "A lawful traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete' the mission of the stop." *United States v. Hernandez-Mendoza*, 600 F.3d 971, 975 (8th Cir. 2010) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

In support of his claim, Defendant cites *United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008). There, the defendant was stopped for failing to conspicuously display a license plate, as required by state law. Within approximately three minutes of the stop, the trooper told the defendant that he would issue a warning ticket. After returning to the squad car, the trooper began asking the defendant general questions about his trip, his family, and his van. Significantly, however, the trooper also engaged the driver "in discussion on topics related to drug trafficking." *Id.* at 1117. The trooper drew the driver's attention to the drug dog which was sitting in the rear of the police car. The trooper asked the driver if there was any reason the dog would indicate to the odor of drugs "when" the dog walked around the van. Approximately 11 minutes into the stop, after the trooper had completed "about half of the warning ticket," he left the patrol car

and walked back to the van to speak with the passenger. *Id.* After returning to the patrol car, the trooper finally called to check on both men's identification – a full ten minutes after the trooper told the driver that he would receive a warning ticket. *Id.* Before dispatch responded on the passenger, the trooper took the dog out of the patrol car and walked him around the van.

The Court of Appeals in *Peralez* began its analysis by noting that "an officer may detain the occupants of the vehicle 'while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *Id.* at 1119 (quoting *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999)). These tasks include "asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." *Id.* (quoting *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005)). These questions may also be asked of any passengers. *Id.* (citing *United States v. Coney*, 456 F.3d 850, 857 (8th Cir. 2006)). In concluding that the traffic stop was unduly prolonged, the Court noted that the trooper interspersed drug interdiction questions with the routine processing of a traffic stop arising from an obstructed license plate. *Id.* at 1120. The Court found that "[t]he off-topic questions more than doubled the time Peralez was detained." *Id.* at 1121.[4]

The facts in this case, however, are distinguishable from those in *Peralez*. Upon returning to the squad car with Defendant, Trooper Simmons immediately began the task of preparing warning tickets for excessive window tint and speeding. Within minutes, Simmons called dispatch with Defendant's driver's license information. While waiting for

---

[4] Even though the Court of Appeals concluded that the traffic stop was unlawfully extended, it nonetheless found that the district court erred in granting the defendant's motion to suppress. The Court noted that the drug dog "was available at the outset of the stop," and that "[i]t took less than a minute for [the dog] to circle the van and indicate the presence of contraband." *Id.* at 1121. "This momentary delay, which occurred while Trooper Schlueter was waiting for the response to his inquiries about Peralez's driver's license, did not unreasonably extend the traffic stop. (citations omitted) This delay would have occurred regardless of the Trooper's off-topic questions." *Id.* at 1121-22.

a response, Simmons engaged Defendant in routine questions regarding his destination and purpose. *See Sanchez*, 417 F.3d at 975. Simmons did not intersperse drug interdiction questions with the routine processing of the warning tickets. Similarly, Simmons questioned Flores regarding their destination and purpose. *See Coney*, 456 F.3d at 857 (finding that "[o]nce [the trooper] heard [the driver's] answers about the trip, [the trooper] had the authority to ask the passengers of the van similar questions."). Unlike *Peralez*, Simmons' initial stop of Bowman was not unduly prolonged.

The facts in this case are more nearly akin to those found in *United States v. Suitt*, 569 F.3d 867 (8th Cir. 2009). There, a deputy sheriff stopped the defendant's vehicle for an expired registration. Three minutes into the stop, the deputy told the defendant that he was going to issue a warning ticket. While writing the warning ticket, the deputy began asking the defendant routine questions about his trip. The defendant's answers were vague and the deputy observed that the defendant "appeared nervous and fidgety." *Id.* at 869. Thirteen minutes into the stop, the deputy gave the defendant a warning ticket and returned his driver's license. As the defendant was walking away, however, the deputy asked the defendant "whether he had 'half a minute' to answer a few final questions." *Id.* In response to a question, the defendant denied that he had anything illegal in the vehicle. The deputy then asked for permission to search the vehicle and the defendant refused, saying that he was "on a tight schedule." The deputy was a K-9 officer and he then decided to walk his drug dog around the defendant's vehicle. After the dog alerted to the vehicle, the deputy searched the bed of the truck and found a large amount of marijuana.

After discussing *Peralez* at length, the Court in *Suitt* concluded that the officer did not unreasonably prolong the stop.[5] The Court noted important factual distinctions between the two cases:

---

[5] The *Suitt* Court initially noted that the *Peralez* Court's statements concerning the unlawfully extended stop in *Peralez* were "non-binding dicta." *Suitt*, 569 F.3d at 871.

[T]here are important factual distinctions between this case and *Peralez* that dissuade us from applying its reasoning here. Until the end of the encounter, Deputy Faiferlick did not ask drug interdiction questions like the officer in *Peralez*, but routine questions about Suitt's travel plans. The Supreme Court has rejected the notion that the Fourth Amendment prohibits questioning unrelated to the purpose of the original detention, provided that such questioning does not prolong the stop. (citation omitted) Nonetheless, whether questioning is related or unrelated to the purpose of a detention is relevant to deciding whether the detention was unnecessarily prolonged. After deciding to issue a warning and without any basis for suspecting that criminal activity was afoot, the officer in *Peralez* proceeded to question the suspects about the presence of guns, drugs, and other illegal activity. Such questioning could not plausibly be related to the purpose of the detention, and therefore it was an impermissible basis on which to "more than double the time Peralez was detained." Here, seconds after announcing his intention to let Suitt go with a warning, Deputy Faiferlick asked Suitt about his travel plans as he was writing the warning ticket. It would be arbitrary to the point of pure caprice if routine questions that would have been plainly related to the stop if asked a few seconds before this announcement lost their nexus to, and became an illegitimate basis for continuing, the detention when asked a few seconds later while Deputy Faiferlick engaged in the necessary process of completing the warning ticket.

*Suitt*, 569 F.3d at 871-72. Furthermore, the Court noted that "there is no indication that the suspects in *Peralez* did or said anything suspicious during the officer's questioning that justified further interrogation." *Id.* Conversely, "Suitt repeatedly gave hesitant, evasive, and incomplete answers to Deputy Faiferlick's questions." *Id.* "Each of Suitt's hesitant responses added piece by piece to Deputy Faiferlick's growing doubts." *Id.*

Turning back to the instant action, the Court concludes that Trooper Simmons' questioning of Defendant and Flores did not unduly prolong the initial stop. At that time, Simmons was asking permissible routine questions regarding their travel plans and

purpose. Within 15 minutes of the time he was pulled over, Defendant was given his warning tickets and, without undue delay, told to "have a nice trip."

### B. Was Defendant Seized Without Reasonable Suspicion?

Next, Defendant argues that after he was given the warning tickets and told he could leave, he was then "seized" by Trooper Simmons without reasonable suspicion. The Government argues that the subsequent contact between Simmons and Defendant was consensual, or alternatively, that it was supported by reasonable suspicion.[6]

### 1. Was Defendant Seized As He Walked Back to His Car After Receiving the Warning Tickets?

As described above, Defendant exited the squad car after being given the warning tickets and told to "have a nice trip." As Defendant was walking back to his car, however, he was intercepted by Trooper Simmons, and asked "have you got time for a couple of quick questions?" Defendant argues that this encounter constituted a seizure, thereby implicating the Fourth Amendment. However, not every contact between a law enforcement officer and an individual constitutes a seizure. *United States v. Drayton*, 536 U.S. 194, 200 (2002). A seizure does not occur if the contact remains consensual. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required.") (internal citation omitted).

The facts here are similar to those found in *United States v. Flores*, 474 F.3d 1100 (8th Cir. 2007). There, a deputy sheriff stopped the defendant on Interstate 80 for twice

---

[6] There are two instances "when an officer may extend or expand the scope of a traffic stop beyond the original justification for the stop." *Peralez*, 526 F.3d at 1120.

> First, if the encounter becomes consensual, the stop may be extended. Second, if the officer develops reasonable suspicion that other criminal activity is afoot, the officer may expand the scope of the encounter to address that suspicion.

*Id.* (citation omitted).

crossing the centerline. When asking the driver for his license, registration, and insurance, the officer "detected a strong air-freshener fragrance emanating from the vehicle" and observed three cellular telephones in the front seat. *Id.* at 1101. After he was asked to sit in the front passenger side of the patrol car, the officer asked the driver routine questions regarding where he was headed, where he had been, and for whom he worked. After determining that his paperwork was in order, the deputy issued the defendant a written warning for driving left of center, returned the documents to the defendant, and told him that he was free to go. As the defendant was "preparing to leave the patrol car," the deputy asked if he could ask him a few questions. *Id.* at 1102. The defendant replied, "yeah, sure," and remained standing next to the passenger side door of the patrol car. From inside the patrol car, the deputy asked the defendant if he had any drugs or weapons in the vehicle, and the defendant responded that he did not. The deputy then asked the defendant if he could search his car, and the defendant replied, "yeah." *Id.*

The Court of Appeals in *Flores* concluded that the driver "was no longer seized within the meaning of the Fourth Amendment after [the deputy] returned his documents to him and issued the warning ticket." *Id.* at 1103. Concluding that the encounter was consensual, the Court found that "the tone of the entire exchange between [the deputy] and Flores was cooperative, Flores had everything he needed to proceed with his journey, and [the deputy] displayed no weapon during the encounter." *Id.* Since the encounter was consensual, the Fourth Amendment was not implicated, and the Court found it unnecessary to determine whether the deputy had reasonable suspicion to justify the encounter. *Id.* at 1104.

Similarly, in *United States v. Munoz*, 590 F.3d 916 (8th Cir. 2010), the defendant was stopped by a state trooper in Nebraska for speeding on Interstate 80. After the trooper handed him the citation and returned his other documents, the defendant "reached for the door handle to exit the cruiser." *Id.* at 919. The trooper then said, "OK, well I would like to ask you guys for a moment of your time." The trooper then talked to the defendant

about "a recurring problem of drugs being driven into Nebraska from Colorado," and asked permission to search the vehicle. *Id*. The Court concluded that the encounter was consensual and did not constitute a seizure.

> The factual findings of the district court show that Munoz was no longer seized once Trooper Jackson handed him the citation and rental agreement. Trooper Jackson was the only officer present, he did not display his weapon, he did not touch Munoz, he returned everything Munoz needed to continue his trip, he merely requested further cooperation, and his statements describing the drug trafficking problem did not suggest that Munoz was the particular focus of a drug trafficking investigation. The fact that Munoz reached for the door handle *before* Trooper Jackson asked for a moment of his time shows that Munoz felt free to leave, but then agreed to cooperate further. Munoz told Trooper Jackson that he should ask for Smith's consent to search the Pontiac, indicating that he was allowing the continuation of the encounter. That Trooper Jackson told Munoz to remain in the cruiser while he spoke with Smith – as Munoz suggested – did not turn the consensual encounter back into a seizure.

*Id*. at 921.

Here, Trooper Simmons had returned Defendant's driver's license, registration, and insurance papers, and told Defendant that he was free to leave. The video demonstrates that Simmons did not block Defendant's path to his vehicle, nor did he raise his voice or otherwise suggest that Defendant's compliance was required. In fact, when Simmons asked for permission to search the car, Defendant refused. Accordingly, Defendant apparently understood that he was not required to consent to Simmons' requests. When Simmons asked whether or not it would be "cool" for a canine to do a free air search of the car, Defendant agreed, responding "yeah, that's cool." The Court concludes that Defendant was not seized during the encounter with Simmons between the cars.[7]

---

[7] The trooper's direction to Defendant to sit in the patrol car while waiting for the dog did not transform the consensual encounter into a seizure. *United States v. McManus*,

(continued...)

### 2. *Did the Trooper Have Reasonable Suspicion to Seize Defendant?*

As set forth above, I believe that Defendant was not seized when he was approached by Trooper Simmons between the cars, after being told that he was free to go. Since the district court may disagree with my analysis in that regard, however, I will also address the issue of whether the seizure, if any, was supported by reasonable suspicion.

To justify a Fourth Amendment seizure, a law enforcement officer must have a reasonable, articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). "Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). The reasonable suspicion standard is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," but requires "at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Id.* at 123-24.

Here, Trooper Simmons observed a newly-registered BMW with heavily tinted windows from a state which Simmons believes to be a drug source state. When Simmons initially pulled up next to the BMW to pace its speed, neither the driver nor the passenger looked over at him. After stopping the vehicle, Simmons observed that Defendant smelled strongly of "air freshener," his breathing was elevated, and the "carotid on the left side of his neck was beating rapidly." Defendant's passenger also appeared "really nervous," his leg was "bouncing," and he avoided eye contact. The car had a "lived in look" and

---

[7](...continued)
70 F.3d 990, 992-93 (8th Cir. 1995).

Simmons observed three cellular phones in the car. Defendant was vague regarding his travel plans and, importantly, there were significant discrepancies between the answers given by Defendant and the answers given by Flores. Simmons also knew that Defendant had a criminal history involving drugs, and Flores had identified himself with a Mexican ID card. Given the totality of the circumstances, and based on his training and experience, the Court concludes that Simmons could reasonably believe that criminal activity was afoot. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'") (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

## C. Did Defendant Voluntarily Consent to A Dog Sniff?

Defendant concedes that he consented to wait to have a canine do a free air search of the car, by responding "yeah, that's cool" to Trooper Simmons' question. Defendant asserts, however, that "[h]is will was overborne by the trooper's actions," and his consent "was not voluntary." Instead, Defendant argues that he merely "acquiesced to a show of authority and the trooper's insistence."[8] The Government argues that "Trooper Simmons had reasonable suspicion criminal activity was afoot, and could have detained defendant pending the arrival of a canine."[9] Alternatively, the Government argues that reasonable suspicion was not required, since Defendant voluntarily consented to the dog sniff.

Regarding Defendant's consent to wait for the arrival of a drug-detecting canine, both parties analyzed the issue as analogous to a consent to search.[10] Both parties cite the

---

[8] *See* Brief in Support of Motion to Suppress at 5 (docket number 16-1 at 5).

[9] *See* Government's Brief in Support of Its Resistance at 16 (docket number 25-1 at 16).

[10] It should be noted that the use of a narcotics detection dog during a lawful traffic stop generally does not implicate legitimate privacy interests, and does not constitute a search for Fourth Amendment purposes. *Illinois v. Caballes*, 543 U.S. 405 (2005).

recent case of *United States v. Arciniega*, which summarizes the factors to consider in determining whether a consent is given voluntarily.

> Whether an individual's consent is voluntary is a question of fact that must be determined from the totality of the circumstances. "The government bears the burden to prove by a preponderance of the evidence that consent to search was freely given, but awareness of the right to refuse is not necessary for consent to be voluntary." Factors relevant to the analysis include (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of his *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which the individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009) (citations omitted).

Regarding Defendant's personal characteristics, he is 55 years old and self-described as the president and CEO of Network Connections. The Defendant appears to be of at least average intelligence. There is no evidence that Defendant was under the influence of drugs or alcohol at the time of the encounter. Defendant was not informed of his *Miranda* rights.[11] Defendant has been convicted on a number of prior occasions and it may be assumed that he was generally aware of the protections afforded to suspected criminals.

---

[11] Defendant was not in custody at that time, and Defendant makes no claim that the officer was required to give him a *Miranda* warning at that time.

Regarding the "environmental" factors, the length of the encounter was brief. It took Trooper Simmons less than 15 minutes to issue the warning tickets. The contact between Simmons and Defendant between the vehicles, when the Defendant consented to "waiting for a canine to do a free air search of the car," took less than a minute. In securing Defendant's consent, Trooper Simmons did not make any threats, display his weapon, physically intimidate, or touch Defendant. Simmons made no promises or misrepresentations. Defendant was not in custody or under arrest when the consent was given, and in fact had been told that he was free to go. Defendant had just refused to give consent to a search of the vehicle, thereby demonstrating that he understood that he was not required to acquiesce to Simmons' requests. The consent was obtained in a public place and not in a secluded location. Finally, from the time Defendant initially consented to wait for a canine, until Jake alerted on the odor of narcotics less than ten minutes later, Defendant made no objection to the search. After considering the totality of the circumstances, the Court concludes that Defendant voluntarily consented to wait for a canine to arrive and do a free air search of his vehicle.

### D. Was There Probable Cause to Search the Vehicle?

Finally, Defendant argues that the officers lacked probable cause to search his vehicle. Defendant concedes that an alert by a reliable drug-detection dog provides the necessary probable cause to conduct a warrantless search. *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) ("Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present."). Defendant argues, however, that Jake – the dog used in this case – is an unreliable indicator of drug presence and received inadequate training.[12]

Jake is a nine-year-old chocolate lab, who has been working with Trooper David Baker as a drug detection dog for nearly seven years. In the summer of 2003, Jake and

---

[12] *See* Defendant's Supplemented Brief at 1 (docket number 28 at 1).

Baker attended a six-week dog camp where Jake was taught narcotics detection. Jake was certified at that time and has been recertified annually since then. As part of the recertification process, the dogs are graded regarding their ability to detect different controlled substances in a variety of environments. The dog is given a score of 1 to 6 for each test, and the scores are then averaged.[13] According to Baker, Jake typically graded out between 2 and 3. At his last certification, on November 17, 2009, Jake scored 2.84, with unsatisfactory ratings given to his ability to locate cocaine in piles of human clothing, and his ability to locate heroin on the exterior of an auto and in a storage room.[14] *See* Defendant's Exhibit A.

In support of his argument that Jake is an unreliable indicator of the presence of narcotics, Defendant offered a number of K-9 usage records and K-9 training records. *See* Defendant's Exhibits B-Y. Defendant claims that there have been a number of "false alerts," where Jake alerted to the presence of narcotics, but no drugs were found. Trooper Baker noted that in many instances, it was undisputed that drugs had been in the area shortly before Jake alerted to the odor of narcotics.

For example, on April 14, 2008, Trooper Baker and Jake responded to a vehicle stop on Interstate 35. The initial trooper on the scene smelled marijuana on the occupants of the vehicle, and found approximately two grams of marijuana inside the car next to the center console. Jake indicated to the presence of a narcotic odor emitting from the open trunk and from the front passenger door, which had its window rolled down. Jake also made a third indication of the presence of a narcotic odor near the center console area. The two troopers then searched the vehicle, but did not find any additional narcotics. *See* Defendant's Exhibit B.

---

[13] The grading increments are: (1) superior, (2) commendable, (3) typical, (4) suitable, (5) improvement needed, and (6) unsatisfactory.

[14] On two of the unsatisfactory scores, the "remarks" section indicates that it was "not presented." Trooper Baker testified that the comment reflects a handler error.

Similarly, on April 16, 2008, Trooper Baker and Jake responded to a call for assistance on Interstate 35. Jake alerted to the presence of a narcotic odor near the front bumper of the truck. He also alerted to the front driver's side corner. No contraband was found, but the driver told the troopers that his fuel tank had recently been worked on by two people who were smoking marijuana. *See* Defendant's Exhibit C.

On July 29, 2008, Jake was deployed by Trooper Baker to conduct a dog sniff on a vehicle after the driver exhibited indicators of criminal activity. In his report, Baker states that as Jake started to sniff the exterior of the Volvo, "he came around to the front where he made [a] flinching motion. It is unknown to me if something shocked him or if he pinched himself, but his behavior dramatically changed and he did no [*sic*] want to come near the Volvo or have nothing to do with sniffing it." *See* Defendant's Exhibit D. Defendant's Exhibit E reflects a stop approximately two hours later. Initially, Jake refused to sniff the vehicle, which Baker described in his report as "nothing I have seen in six years of handling Jake." After allowing Jake to "relax" for ten minutes, however, he alerted to the presence of a narcotic odor near the rear passenger door. However, a hand search of the vehicle did not reveal any contraband.

On February 11, 2009, Jake alerted to the presence of a narcotic odor, but a thorough hand search found only "two very small particles on the floor board that looked to me that were marijuana." However, the owner of the vehicle had recent marijuana and paraphernalia charges in his criminal history. *See* Defendant's Exhibit K.

On February 24, 2009, Jake was taken to a residence in Livermore, Iowa, where he alerted to the presence of a narcotic odor in the lower level of the house and again in the attached garage. Three pounds of marijuana were found in an old television console in the garage, but no other contraband was located. *See* Defendant's Exhibit L.

On February 26, 2009, Trooper Baker and Jake were dispatched to a vehicle stop on Interstate 80. Jake alerted to the presence of a narcotic odor on the driver's side of the van. The occupants of the vehicle admitted that they were marijuana users, and rolling

papers were found in the wallet of one occupant. The occupants admitted using drugs, but "had none left on this trip back to Pennsylvania." No contraband was found in the vehicle. *See* Defendant's Exhibit M.

On March 4, 2009, Trooper Baker conducted a traffic stop on Interstate 80. After observing indicators that suggested criminal activity, Baker deployed Jake to sniff the vehicle. Jake alerted to the presence of a narcotic odor near the rear passenger corner. No contraband was found in a subsequent search, but the driver's wallet contained "a pharmaceutical fold which had white powder residue inside it along with a razor blade with a powder on it." Also, laundry detergent was thrown about the floor in the cargo area, and 12 pine tree air fresheners were in a cubby hole in the front interior of the Honda." *See* Defendant's Exhibit O.

On January 21, 2010, Trooper Baker and Jake were called to the Flying J Truck Stop to assist a DOT officer. Jake indicated to the presence of a narcotic odor emanating from the semi in three different locations. A hand search of the cab and trailer were conducted, with no contraband found. The driver admitted, however, that others had used marijuana inside the cab within the last three days. *See* Defendant's Exhibit Y.

In only one case could the Court find an instance where Jake alerted to the presence of a narcotic odor, with no apparent connection to the presence of controlled substances. On March 10, 2009, Trooper Baker was called to assist another trooper with the stop of a large Winnebago motor home on Interstate 80. The initial trooper on the scene told Baker that the driver and vehicle had indicators of possible drug smuggling. Jake was deployed to sniff the exterior and interior of the vehicle. Jake alerted to the presence of a narcotic odor near a storage compartment. Several troopers searched the motor home, but found no contraband. The driver, who purchased the motor home new two years previously, "emphatically denied" any connection with narcotics or "any scenario that would link this motor home with any narcotics or any people who did narcotics." *See* Defendant's Exhibit P.

Other exhibits offered by Defendant reflect that during training exercises, Jake sometimes missed narcotic odors which were present. *See* Defendant's Exhibits G, H, I, and J. There is no indication, however, that Jake falsely alerted to the presence of a narcotic odor in training sessions when no narcotics were present. *See* Defendant's Exhibits N, S, and W.

A dog's training and certification to detect drugs provides "facial validity" in his reliability. *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999). If his performance record raises questions about his reliability, however, then further inquiry is required. *Donnelly*, 475 F.3d at 955. The Court concludes that the record here falls far short of establishing that Jake is unreliable when alerting to the presence of a narcotic odor. In *Donnelly*, the dog received consistent training, had been examined and considered competent by independent evaluators, had been properly certified, had been considered reliable by prior courts, and his accuracy rate exceeded 50 percent. While the Court recognized that the dog in *Donnelly* was "not a model of canine accuracy," it nonetheless concluded, based on the totality of the circumstances, that "there was a fair probability that Donnelly's vehicle contained drugs." *Id*. at 955. Here, Jake receives 4-5 hours of training weekly, he is evaluated and certified annually, and he does not have a significant history of alerting to the presence of a narcotic odor when no narcotics have been present. The Court finds that Jake is generally reliable, and his "alert" in this case provided officers with probable cause to search Defendant's vehicle.

## VI. SUMMARY

Defendant concedes that Trooper Simmons had probable cause to stop his vehicle for excessive window tint. After less than 15 minutes, Defendant was given a warning ticket. As the Defendant was returning to his car, however, Trooper Simmons asked "have you got time for a couple of quick questions?" The Court believes that this contact was consensual. Even if the encounter was not consensual, by that time Simmons had a reasonable suspicion that criminal activity was afoot.

Defendant then voluntarily consented to wait for a canine to do a free air search of the car. Even if the consent was not given voluntarily, Trooper Simmons had the requisite reasonable suspicion necessary to detain Defendant long enough to conduct the dog sniff. After Jake alerted to the presence of a narcotic odor emanating from the vehicle, Simmons had probable cause to conduct a search. Defendant's claim that Jake is an unreliable indicator of the presence of narcotics is unfounded. Accordingly, I believe that Defendant's motion to suppress should be denied.

### VII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that Defendant's Motion to Suppress (docket number 16) be **DENIED** by the district court.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on May 25, 2010.*

DATED this 3rd day of June, 2010.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA